## RIGHTS OF A REJECTED APPLICANT FOR A LIQUOR LICENSE.

### Superior Court of Cincinnati.

THE STATE OF OHIO, ON RELATION OF WILLIAM W. DAUGHERTY,
v. ROGERS WRIGHT AND WILLIAM MARCHHEUSER, CON-
STITUTING THE HAMILTON COUNTY LIQUOR
LICENSING BOARD.

### Decided, December, 1913.

*Intoxicating Liquors—Applicant for License Rejected Because Quota
Full—Entitled to a Hearing, When—Mandamus to Compel Granting
of Hearing—Registration of Protest.*

1. Where there are more applications made for liquor licenses than
   there are licenses to be granted, and the only reason for the re-
   jection of a certain application is that the constitutional quota has
   already been filled, the endorsement of "full quota" on the appli-
   cation is a sufficient statement of the reason for rejection, within
   the meaning of Section 28 of the liquor license code.
2. Where an applicant possesses all the qualifications required by law
   for obtaining a liquor license, and his application is rejected for
   the sole reason that the quota is full, such rejected applicant is
   entitled to a hearing by the county licensing board, the same as an
   applicant rejected for any other reason, as provided in Section 29
   of said code.
3. Where such rejected applicant has been denied a hearing by the
   county board, and thereupon makes application promptly to a
   court, prior to the fourth Monday in November, for a writ of man-
   damus, a peremptory writ will be granted, even after licenses have
   been issued, to compel the board to grant such rejected applicant a
   hearing as provided by law.
4. An applicant is as much a citizen after his application is rejected
   as he was before, and as such has a right to register protests, not
   only against the granting of applications for licenses but also in
   favor of the revocation of licenses already granted, and when a
   county board refuses him leave to register such protests mandamus
   will lie to compel it to do so.

*H. P. Karch* and *J. J. McCartin,* for relator.
*John A. Deasy,* contra.

SUTPHIN, J.

This is an action by the State of Ohio, on the relation of William W. Daugherty, against the two members of the Hamilton County Liquor Licensing Board, in which it is prayed that a writ of mandamus issue against said board compelling them to permit the filing of protests against the granting of liquor licenses to certain alleged unqualified applicants and for a hearing thereon, and further to compel the said board to grant a reconsideration and hearing upon the application of the relator for a liquor license, and for such other and further relief as the relator may be justly entitled to.

To this petition of the relator defendants filed a demurrer, in which they set forth several grounds, the only one, however, which is urged upon this court being that the petition does not state facts sufficient to constitute a cause of action. The effect of ·the filing of a demurrer is to admit that the allegations set forth in the petition are true, and therefore the sole question presented to this court is whether upon the facts stated in the petition the relator is entitled to the relief prayed for. A brief statement of the facts so pleaded is as follows:

The relator, Daugherty, is a citizen of the United States, and the last four years past has been a resident of Hamilton county, state of Ohio; since April, 1910, he has been engaged in the retail liquor business, which he has always conducted according to law; that on or before September 15, 1913, he made application in due form to the defendant board for a liquor license, at which time he possessed all the qualifications required by law. His application was rejected without cause; on or about November 18, 1913, he learned that the defendant board proposed to issue licenses to certain applicants who did not possess the qualifications required by law, some of whom lived in his vicinity; he thereupon demanded of the defendant board the right to file and have heard protest against the granting of such licenses, which was refused; he also demanded a hearing upon his own application which had been rejected, but this was also refused. He claims that unless the board is compelled to grant him these hearings he will suffer an irreparable injury for which he has no adequate remedy at law.

In addition to the facts set forth in the petition, there are certain other facts which have been mentioned in argument and in briefs of counsel, of which the court has been asked to take judicial notice. A reference to them is perhaps helpful to a better understanding of the case under consideration. These facts are that in Hamilton county alone there were some thirteen hundred applications for saloon licenses on file with the board September 15, 1913, whereas under the constitutional limitation only eight hundred and two licenses could be granted. The list of those to whom the board proposed to grant licenses was first made known and published November 5, 1913. Of the five hundred applications which were rejected, over three-fourths were rejected without any cause except that the quota was full. Subsequently thereto, to-wit, on November 17, 1913, fifty-seven of those on the proposed list were rejected and their places filled by selections made from the original rejected list. All licenses allowed were issued November 24, 1913, which was the fourth Monday in November.

The petition was filed in this court on November 20, 1913, and an alternative writ of mandamus was issued, notice of which was duly served upon the defendants. The effect of the issuance of this writ was to order the defendants to comply with the prayer of the petition or show cause before the court, at a specified time, why they should not do so.

A determination of the questions in this case involves a careful examination of the constitutional amendment, Article XV, Section 9, adopted September 3, 1912, and an act of the Legislature approved May 3, 1913, commonly known as "the Ohio Liquor License Code," 103 Ohio Laws, 216. Prior to the adoption of this constitutional amendment Section 18 of the schedule of the Constitution of Ohio read as follows:

"No license to traffic in intoxicating liquors shall hereafter be granted in this state; but the General Assembly may, by law, provide against the evils resulting therefrom."

A history of the liquor laws of this state is not only interesting, but is helpful in understanding the effect of the constitutional amendment of September, 1912. Prior to the Constitu-

tion of 1851 there was no constitutional provision on the subject; but laws were in force prohibiting the sale of liquor except by duly licensed tavern keepers. Certain difficulties were encountered which led to the abolishment of licenses and the vesting in the General Assembly of the power to legislate on the subject. In other words, while the state was not willing to give its approval to the traffic in intoxicating liquors, such as might be implied from an affirmative grant of licenses, yet it recognized the existence of the business itself and desired to clothe the General Assembly with power to legislate concerning it (*Bloomfield* v. *State,* 86 O. S., at 261).

The Legislature has exercised this power in various ways, such as the imposition of a heavy tax upon the right to conduct such business. While that section of the Constitution was a continuing admonition to all persons engaged in the traffic, that in doing so they were always subject to the power of the General Assembly to provide against evils resulting from the traffic, yet at the same time one who conducted such business in a lawful manner was entitled, under the law as it existed, to the same protection which was accorded to dealers in other articles of personal property. *State* v. *Hipp,* 38 O. S., 199, at 222.

Under the constitutional amendment of September, 1912, this order of affairs was completely changed, and the state was expressly authorized to issue a positive, actual grant which secures to the grantee a specific, definite right to traffic in intoxicating liquors. Our Supreme Court has defined a license, in *State* v. *Frame,* 39 O. S., 399, as follows:

"A license is essentially the granting of a special privilege to one or more persons, not enjoyed by citizens generally, or, at least not enjoyed by a class of citizens to which the licensee belongs."

The constitutional amendment of September, 1912, definitely and positively prescribes that there shall not be more than one saloon for each five hundred population in municipalities. This is followed by provisions that licenses shall not be granted to any applicant—

1. Who at the time of making application (*a*) is not a citizen of the United States, (*b*) is not of good moral character.

2. Who is in any way interested in the business conducted at any other place.

3. Unless he is the only person in any way pecuniarily interested in the business for which the license is sought.

4. Unless the place of traffic is located in the county or in an adjoining county to where persons reside whose duty it is to grant such licenses.

After licenses have been granted they shall be deemed revoked,

1. If any other person than the licensee is in any way pecuniarily interested in the business.

2. If the licensee is convicted more than once for the violation of any liquor laws.

This brings us to the provisions of the act of the Legislature known as "the Ohio Liquor License Code." After providing that applications for license shall be filed between September 1st and September 15th, and setting forth in detail what such application should contain, the statute provides that it shall be the duty of the board to announce the names of those to whom the board proposes to grant licenses not later than November 5th, at which time the board shall also announce the list of those applications which it proposes to reject. In other words, when all the applications are filed on September 15th the board has until the 5th of November, if it sees fit to take that full period of time, to determine what applications shall go on the "proposed list" and what applications shall go on the "rejected list." Each rejected applicant is entitled to have endorsed upon his application the reasons for its rejection, and it is the absolute and specific duty of the board to so endorse such applications. The rights of such rejected applicant are set forth in Section 29 of this code in the following language:

"In all cases where an application is rejected, the applicant shall be given a hearing upon the announcement of the said rejection by the county board. The said rejected applicant shall upon the day of the rejection be notified by the secretary of the county board of the fact of rejection, and shall be given a list of the complaints, if any, made against him, her, it or them, with the names and addresses of the complainants. Said notification shall be in writing and shall specify the time for a

hearing on the application so rejected, which shall take place at the office of the board not more than five days after notice is given.''

This same section provides that such rejected applicant shall have the right to be present at the hearing, either in person or by counsel and the mayor as well as the prosecuting attorney of the county shall have the right to be present at such hearings, and notice shall be sent to such officers at the same time notice is sent to the applicant.

The act further contemplates that the board might recall its original decision as a result of such hearing, as shown by Section 31 of the act, which reads as follows:

''If after a hearing, the said board recalls its decision and grants the application, and in so doing rejects the application of another applicant whose name was contained on the announced list of applications proposed to be granted, the applicant thus alternately rejected shall be entitled to a hearing with all the privileges and under the same conditions mentioned in the foregoing sections.''

In other words, such a hearing might result in the rejection of an applicant whose name was on the proposed list, and the recalling of a prior decision of rejectment, and the granting of the application of the applicant first rejected. The section goes on to say:

''But all decisions as to the rejection of applicants, who shall have applied prior to the beginning of the license year, shall be final on the fourth Monday in November following, at which time the licenses allowed shall be issued.''

Another significant provision of this act is Section 27, which reads as follows:

''Any citizen may register with the county board protests against the granting of licenses or in favor of the revocation of any license. Said protests shall set forth the facts upon which the complaint is based, and shall be signed and sworn to by the complainant or complainants.''

From this it will be observed that while the right to protest against the granting of licenses might be exercised at any time

· up to the fourth Monday in November, it would seem that it could be more intelligently exercised only after the list of proposed licensees had been published. On the other hand, the right to protest in favor of the revocation of any license necessarily could not be exercised until the license is granted, which would be after the fourth Monday in November. In this connection the county board is given express power to revoke a license, as provided by Section 16 in the following language:

"It shall be the duty of the county liquor licensing boards of the respective counties of the state, and they are hereby authorized   *   *   *   to suspend or revoke, subject to the conditions and in the manner provided by law, all licenses granted or renewed in said county."

Applying these statements and conclusions of law to the facts in this case, we find that the relator made application for a license, and on November 5th was informed that his application had been rejected. He complains, first, that this rejection was without cause, or rather, that the only cause endorsed on the petition was "full quota." As there were many more applications for a license than there were licenses to be granted, it is impossible to see what else the board could have endorsed upon his application. Such endorsement indicates quite clearly that no complaints had been filed against his application, and that no information had been discovered by the board which would warrant the refusal of his application. It was simply a case where the power of the board had been exhausted by the allowance of the full quota of licenses provided by law.

The relator next contends that as a rejected applicant he was entitled to a hearing by the board, and the language of Section 29 above quoted, would seem to justify his claim. The defendant very adroitly contends that if the applicant was rejected only because of "full quota," a hearing for him would be "a vain and useless thing," that therefore common sense dictates that the act did not contemplate giving a hearing to such a rejected applicant. This raises a very serious question, because if such construction is correct it would render nugatory the clause granting a hearing to rejected applicants. It is a well es-

tablished principle of law that in the construction of statutes it is the duty of the court to give full consideration to every word in the statute and to construe the law as meaning what it says, if it can possibly do so. Now, a careful examination of Section 29 above quoted, would seem to indicate quite clearly that the right to a hearing does not depend upon the existence of complaints—it merely provides that if there are any complaints, the rejected applicant is entitled to be furnished with a list of them before the hearing is had. For example, suppose the applicant was rejected because of some complaints filed against him, and, after having been furnished with a list of such complaints, appears before the board at a hearing and is successful in convincing the board that the complaints are unfounded, what then; it does not mean that he will necessarily receive a license. The board may still reject him because the quota is full, in which event such applicant would be in no different position than the applicant who was originally rejected because the quota was full. Would the court therefore be justified in concluding that there was no purpose to be served by the granting of such hearing? The court is not concerned with the question as to what the Legislature intended to enact, but with what is the meaning of that which it did enact. The language is clear and comprehensive, and therefore it should be held to embrace all cases fairly coming within its term, if they are also within its reason and spirit. The court can well understand that such a rejected applicant might desire to take advantage of his right to a hearing for the purpose of appealing to the discretion of the board. The court has no power to interfere with such acts of discretion on the part of the board. But that is not saying that a rejected applicant might not make a strong appeal for reconsideration if he had the opportunity of a personal hearing, especially when it is realized that the board in making selections as between equally eligible applicants could only justify their selections as the exercise of due discretion on their part, which the court is bound to presume was a reasonable exercise of same until the contrary is shown. A rejected applicant would naturally be interested in creating a vacancy, because he would have just such a chance of being selected to fill it as would be proportionate

to the number of other rejected applicants. He might have knowledge or information regarding a proposed licensee which has not been brought to the attention of the board, and which would affect their action. He might have information tending to show that a proposed licensee does not possess the constitutional requirements. If such information was brought to their attention, the board would in the performance of their duties be obliged to at least give it careful consideration and perhaps take steps either to refuse a license or even to revoke a license already granted, after a proper hearing.

The court therefore can not say just what might take place at such a hearing. Section 31 of the code reads, "If after a hearing, the said board recalls its decision and grants the application," etc., which clearly indicates that the board might change its ruling as the result of such hearing; it might recall its decision and even grant a license to an applicant originally rejected. In other words, such a result is within the express contemplation of the statute. It follows therefrom that the court would be unwarranted in saying that such a hearing would be a vain or useless thing, and the court therefore holds that the relator in this case should have been afforded such hearing.

That right or opportunity for a hearing was denied the relator in this case—that is his complaint. No right of appeal was granted him under the act, and therefore he came into this court on November 20th and asked that the board be directed to grant him such a hearing. The board had notice of his application to this court and took no steps to grant him a hearing, but comes into court now and says that even if he should have had a hearing prior to November 24th it would be useless for the court to order them to grant him a hearing now because the time has passed when the hearing would be of any avail to such rejected applicant. Such contention appeals to the court as unfair and unreasonable, and the court is not prepared to say that such a conclusion would find support in a reasonable and proper interpretation of the statute. A hearing afforded this rejected applicant even now might result in the revocation of licenses already granted, which would immediately create an unfilled quota, and this relator would not

only have a chance of being selected to fill such vacancy but the public would be benefitted by having licensees eliminated who did not possess the constitutional qualifications.

It may be said that if a hearing was to be given every rejected applicant in this county it would have been almost impossible to have held all the hearings called for within the limited time above set forth. The court can readily understand the force of such observation, but because there are difficulties to be met with in the enforcement of this law would not furnish any reason why the provisions of this law should not be enforced, especially when the failure to do so might cause irreparable injury and loss to the person affected. It is the well established policy of the law to grant every person a hearing, whether he stands accused of some crime or of some civil liability, or where the state proposes to take from him some property right. We must therefore infer that the provisions of this liquor license code were designed to adhere to that well established policy of the law, and, before finally rejecting the application of a person who had been engaged in this particular line of business for many years, he should be given a chance to be heard, a chance to confront his accusers if there were any, all with the view that when this local board reached a conclusion it would be a just conclusion, based upon a full hearing accorded to such applicant.

There is still another question in this case. The relator witnessed the switching of the fifty-seven cases on November 17th —the re-filling of an already full quota—and learning that certain of these newly proposed licensees were not eligible and did not possess qualifications required by law, went before this board and asked leave to file, and have heard, protests against the granting of licenses to such applicants. He appeared before them not only as a rejected applicant, but as a citizen, and as such had a clear and unqualified right to protest against the granting of any licenses or to urge the revocation of any licenses already granted, as provided in Section 27 above quoted, and the board was entirely without authority in refusing him leave to register such protests. Counsel for defendants says that the board was justified in doing so because the petition does not

state that the complaints were in writing and sworn to, as required by law. Such a contention begs the question—the relator complains because he was refused leave to file such complaints, and the court will presume that if he had been granted permission he would have filed complaints in the manner and form required by the statute.

Furthermore, if such protests or complaints charged that a proposed licensee was lacking in any of the required constitutional qualifications, such as is alleged in the petition, a decision as to whether a hearing should be granted would not rest in the discretion of the board, but it would become the absolute duty of the board to notify the party complained of, furnish him with a copy of the complaint, and set a day for a hearing. This is of the utmost importance because if such charges proved to be true the board would have had no power to grant such person a license, and whether such charges were well founded or not could only be determined after a hearing had been had. To give any other interpretation to the law would be to render it unconstitutional, because the Constitution expressly provides that *the applicant must possess certain qualifications at the time of making application, and that a license shall not be granted to any one who does not possess such qualifications.* While such a hearing should be had promptly, it is immaterial whether it is had before or after November 24th, because the result would be the same—the rejection of an application in the one case, or the revocation of a license in the other.

This liquor license law in many particulars is complex and involved. It would seem to be designed primarily for those counties in which the number of applications for licenses fall within the constitutional limitation. It is unfortunate that its provisions do not more clearly express and define the rights of those whose applications were rejected for no other cause than that the quota was full.

However, looking at the law as an entirety, it would seem that the Legislature has endeavored to carry into this act the spirit of the Constitution. This constitutional amendment expressly authorizes the state to grant a definite right to traffic in intoxicating liquors and, in order to protect the public from

the evils incident to such business, imposes strict requirements prominent among which is that the applicant shall possess good moral character. The legislative provisions granting the right to hearings and the right to file protests would seem to be designed for the purpose of creating an automatic balance between those applicants who have been rejected and those who have been accepted. Those who, though possessing the qualifications, have been denied the right to carry on such business have an incentive to watch more closely the conduct of those to whom licenses have been granted, and the likelihood of protests from this class, as well as from any citizen, must necessarily furnish a constant stimulus to a high standard of conduct and obedience of the law by licensees.

In conclusion, the court is of the opinion that the relator was entitled to a hearing upon his rejection, and as it was not granted to him he is entitled to that hearing now; further, that the relator was entitled to file protests against the granting of licenses to those who did not possess the constitutional qualifications, and as that right was denied him at the time complained of, the board should grant him leave to file such protests now; that as licenses have been issued, the board should cause hearings to be had upon such complaints to the end that if the board should be satisfied that such licensees do not possess the constitutional requirements, their licenses should be recalled or revoked and given to those possessing the qualifications whose applications were rejected merely because the quota was full.

Therefore the demurrer will be overruled, and unless the defendants desire to plead further, the court will grant a peremptory writ in accordance with the conclusions above stated.